Good morning, your honors, and may it please the court. Kathleen Sullivan for Miller Coors. Keystone Light is an economy beer packaged in blue, gray, and white with images of snow-capped mountains. Stone IPA is an ultra-premium craft beer packaged in black, green, and white with an image of a fierce, long-horned, long-eared gargoyle. No reasonably prudent beer consumer would ever confuse the two, especially because Stone IPA is priced at three to four times the price of the economy Keystone Light. Yet the district court allowed a federal jury to award Stone $56 million for trademark infringement. This court should reverse. I'd like to begin with Latchis, because the case never should have gone to trial. This is a textbook case of Latchis, which, of course, still applies in trademark, even if it doesn't in copyright. Let me cut to the chase on that question. In 2010, there was the cease and desist letter, but your client did not actually begin its Stone campaign until several years later. And if a cease and desist letter does its job for a while, and there's no action on it, why would someone be motivated to bring suit until the new campaign, the new way of decorating the can and so on, occur? That's incorrect, Judge Graber. The use of stone, stones, and hold my stones, which is what the cease and desist letter referred to. And if you look at nothing else in the record, your honors, I commend your attention to the exact language on excerpts of record 2182. The cease and desist letter says, it has come to our attention that Miller Coors is marketing the Keystone product under the brands Stone, Stones, and Hold My Stones. I apologize, your honor, for saying that in federal court. But Stone, Stone, and Hold My Stones were used from the early 90s. In fact, it was conceded, even by the former founder of Stone, that Stones is how consumers referred to Keystone products. Now, Judge Graber, focusing on the period from 2010 to 2018, is undisputed in the summary judgment record. And I commend the court's attention to excerpts of record 2205 to 40, which has the chronology. And you will see that- Wasn't there a new campaign that started in about 2017? Not a new campaign, your honor. There was a trivial typographical change in the packaging of Keystone Light. 2017 does not mark a rebranding. You can tell this from the summary judgment record. Let's go back to 2010 to 2018, because it's important, your honor. Stone, Stones, Hold My Stones are all over our branding from 2010 to 2018. Didn't internal documents refer to it as a refresh, though? Refresh, but not rebranding, your honor. But let's go back. Let's compare 2010 cease and desist letter to the complaint. 2010, don't use Stone, Stones, Hold My Stones. Complaint, you use Stone, Stones, Hold My Stones, stone-centric branding. But there is stone-centric branding from 2010 to 2018. And this is where the court went astray, your honor. Let's look at 2010. First of all, the boxes, the cartons, have said 30 stones or 15 stones from time immemorial. They said it in the 90s. They say it continuously 2010 to 2018, so stones have been used- What you can read, though, post refresh or whatever you want to call it, the stones become much more prominent, because previously, I mean, except for what I think that Keith Stone issue, but it is 30 stones on the packaging, and that's it. But afterwards, stone becomes much more prominent as a standalone. You grab a stone, and if you want, if it's- A heroic loner, right? Your honor, two problems with that argument. Number one, look at the boxes. Blue brief, 16. Compare the boxes. Blue brief, 16, and the record sites are there. The boxes are identical. Keith Stone, light, 30 stones before the refresh. Keith Stone, light, 30 stones after the refresh. And by the way, the yellow housemark showing this as a Coors beer is on the boxes all this time. So 2016 to 2017, to call that a rebranding is ridiculous. A key stone, light, as stones. We did not. The only difference between the 2016 box and the 2017 carton is Keith Stone, a compound word referring to the Rocky Mountain origins of the beer, is broken into two lines. There's not a lot of real estate in marketing. Sometimes you have to break words into two lines. It was done on the cans as well. Okay, but what about the billboard? I'm looking at the answering brief on page three. Grab a stone. If it's smooth, you want it. It's a stone, you get it. Your honor, first of all, I really want to get back to 2010 to 2018 because it's urgent for me to convince you that Stone, Stones, and Hold My Stones were all over the market 2010 to 2018. You got me on that. That is clearly Stones was there. Keith Stone, Hold My Stones is the subject of an expensive television, radio, and billboard campaign from 2010 to 2015. It was not used in the singular at that time though, correct? It was absolutely, your honor. What 30 stones is the plural of a stone. A can is a stone, 30 stones is 30 cans. But the can didn't have that as the prominent feature? Your honor, the can doesn't, the can, Keith Stone is a compound word. If the Hard Rock Cafe starts italicizing rock, that doesn't mean it now infringes Dwayne Johnson the Rock's trademark. It might if he owns a restaurant. Well, your honor, let's go back. I want to answer Judge Graber's question. The term stone is used in the singular between 2010 and 2018. Stonehanded games, singular. That's 2013 campaign. Use our packaging for your backyard games. Keith Stone, his name is singular. He's not called Keith Stones. He's a character called Keith Stone, and he says, hold my stones. That's 2010 to 2015. 2015 to 2016, hunt for the great white stone, a promotion during hunting season. Hunt for the great white stone, and if you find it, bag my stone. So the singular, your honor, is simply used. Now, why was this important? We relied. 2010, they say cease and desist. We say, we're not going to cease and desist. Miller, of course, clearly wrote back and said, we are not going to change our packaging. Stone, stones, hold my stones. We're going to keep doing it, and we did, and we relied, and they allowed us. So all of this really rises and falls on what happened in 2017 in the sense of was it a major redo or not, and the internal documents suggest that it was meant to be. Your honor, that's exactly right, and your review here is de novo. I was just going to ask about that. There's a standard of review here, and I'm wondering why we should view this as more legal rather than more factual. Well, first of all, it's the law of the circuit, your honor. The Tillamook County case at 465 F3rd at 1109 says the standard of review for the start date is de novo. If we didn't have the cease and desist letter from 2010, if the court was trying to find out fact, that was SPC on notice that we were saying, stones, stones, hold my stones, then we might have a factual issue. We do not here because we have the letter, and your review is de novo whether it's a refresh, and Tillamook respectfully decides this issue for you under either standard of review. Tillamook says it's de novo. Internet Specialties later says whether it's de novo or clear error review, the start date was wrong. If you look at Internet Specialties, my friend Mr. Hagee's favorite case on this issue, it actually favors us because under that reasoning we went under either standard. Let me show it, but let me focus on why Tillamook is helpful. There was a logo refresh. Tillamook is a case where along comes the battle of the smoker versus the creamery. They come along, they refresh the logo, new symbol, new font size, and Judge Friedland, a typographical change like a letter change in font is something that the Tillamook court correctly deemed legally insufficient, legally insignificant. Now, Judge Graber, I would have a problem with your question if we'd rebrand it. Rebranding as we stop, let's give up on keystone light, alpine mountains. Let's go full gargoyle. Let's change to green white. Let's just go with stones. Had we done that, the laches clock might have been reset, but we didn't change the core elements of the branding. Breaking keystone into two words is not legally significant. Now, Your Honor, we win even if the standard is fairer abuse of discretion. If this wasn't a classic lulling case that shows why laches exists, don't say stones, stones, hold my stones. We do for eight years and they don't sue us. Why the doctrine of progressive encroachment doesn't apply then? Yes, Your Honor. This is not a progressive encroachment case because there's no change in context, there's no change in market, there's no change in target audience. We sold keystone light as an ultra inexpensive beer in large packages, calling them 30 stones, advertising them, branding them with hold my stones and the stones and grab a stone and hunt for the stone and the great white stone and the stone spangled summer, another use of the singular, for eight years. We didn't change markets. We were nationwide from the beginning. We didn't change target audiences. We wanted the audience that liked to buy cheap beer in large quantities. They didn't care if it was hazy or hoppy or whether it was, you know, they didn't want $2.50 for all those adjectives. They wanted 60 cents for lots of beer. We marketed to the same people. This is not a progressive encroachment case. Nowhere close. Your Honors, I want to spend some time on likelihood of confusion, but I would just like to sum up by saying if this isn't an easy latches case, I don't know what would be. Because there's no refresh in 20, there's no rebrand in 2017 and you will rarely have a case where you can hold up the cease and desist letter in one hand and the complaint in the other and find the exact same objection. Don't say stone. Don't say stones. Don't say hold my stones. Ah, eight years later, you said those things. But they didn't sue us by 2014. The analogous California statute of limitations had run. And Judge Graber, one last point. Even if we had made stone stand out a bit more, you'll see if you focus on Blue Brief 16 that the stone word looks like a can. The stone word looks like a can and keystone is broken into two words. Even if you think that's a more accentuated use of stone, that's what latches entitled us to do. Once we weren't sued by 2014, we were entitled to think they didn't sue us. It was a paper tiger that cease and desist letter. And we were lulled. And that's why latches exist. Because why? We like competition. We don't want trademark owners to think that they can sue people out of the blue when those other people have relied on their not suing them during the statute of limitations. If I may turn to likelihood of confusion. I have a question about the damages. I don't want you to run out of time. The biggest question I have is, how did arrogant bastard get swept up in this? That's very surprising to me. That's got to come out. I'm sorry. What was the question? I didn't hear. No, I didn't hear you. Another term I'd rather not say in federal court, Connor, but since we've done hold my stones, let me get to arrogant bastard. Oh, okay. That has nothing to do with Stone IPA. And that accounts for about $6 or $7 million of damages. So if you give me nothing else before I walk out of here, $7 million come off the top for arrogant bastard. Before we do that, what was their- I'd like to do a lot before that, and I hope I won't run out of time. But what's their theory on why arrogant bastard should be swept in with this? Well, it's very unclear what their theory is. The case was tried as a confusion case. And I do want to get to likelihood of confusion, because I think that's the second way this court can reverse. Their theory was somehow that everything that Stone does is somehow tarnished by an association with a beer. It likes to insult our product, Keystone Light, which is a very popular beer. Somehow, if you're associated with the dregs of Coors, you're going to lose revenue on all your products, even if nobody has the foggiest idea that it's Stone, which arrogant bastard does not use a Stone mark. So that shouldn't have been in there. The damages is- So I thought the theory was that if a distributor dropped Stone because they were losing sales, that they would drop all the brands of Stone. Your Honor, that's the theory. But trademark infringement turns on confusion between the marks. And with your permission, I'd love to get to that, because that's what I really want to focus on with my remaining time. Because it is the theory that it's the distributors that were confused, not the- Well, the distributors would punish Stone because of all this. And there was evidence of that in the presented. There's a light evidence, weak evidence, but it was presented. So I just wanted to know why that shouldn't be protected. Your Honor, we think the past lost profits, including the arrogant bastard products, should be thrown out entirely. Because the case was not- It was tried as a confusion case. It was not tried as an association case. And the association evidence, if that's what's causing the distributors' actions, should have no bearing. We actually think the whole past lost profits, 26.24 million, should- Sorry, the entire past lost profits, the 32.7 million, should go out. And we think there's no future lost profits. That's non-speculative. And we think the corrective advertising budget is ridiculous, because it's 100% of the Miller-Kors budget. But I'd rather rest on the brief for that. Because I'd much rather persuade the court. And Judge Friedland, I'm going to ask if you'll permit me any additional time. If we keep having questions, we'll keep letting you go. And I actually do have a question that maybe isn't what you're about to do next. So, looking at the sales of Stone, it seems like they were going up and then they're going down right around soon after the time of this refresh. Correlation is not causation, Your Honor. I understand that. But do you have a theory? So, like, you suggested in the brief COVID, but COVID was later. And then you also, I think, suggested the crowding of the craft beer market. And I'm just wondering whether there's any evidence of other craft beers going down because of crowding. The evidence, Your Honor, absolutely. Craft beer becomes crowded. Stone is a pioneer. Now there's craft beers with short shelf lives being sold to local audiences in every college town in America and across the nation from Portland to Brooklyn. But was there evidence in the record of anyone else with a curve like this? Yes, Your Honor. So, I would refer, Your Honors, to three sources in the record. The concession by SBC CEO Stipp that craft brewers more than doubled from 2015 to 2020. So, that's the crowding evidence. That's excerpts of record 48. But that doesn't mean that other people's sales went down also. Yeah. The Nielsen switching data. There's three sets of Nielsen switching data. That's third-party evidence on who's shifting to whom. And if you look to those excerpts of record 1369, 1129, and 1142, they're both ways. They're Keystone switching to other brands and Stone switching to other brands. You see Stone losing out to other premium brands, including all other premium brands. You don't see any Stone losses to Keystone Light. You don't see any losses to it, ultra-inexpensive beers anyway. And you certainly don't see any Keystone buyers shifting to Stone. So, Your Honor, I would refer you to that. And just in case you're wondering why you should rely on that, don't take it from me. Take it from the damages expert, SBC's damage expert, Dissler, admitted, and this is excerpts of record 714, that there were no switches from Keystone to Stone, Stone to Keystone, relying on the Nielsen surveys. So, I think this might get to this issue of whether it's confusion or this association problem. Yes. So, Your Honor, confusion, I don't need to remind this Court that the touchstone of trademark infringement is likelihood of confusion as to the origin of the product. And as the old saying goes, a picture is worth a thousand words. And again, if you look at nothing else in the record, I commend the Court's attention to the comparative photograph that we reprint on page one of the blue brief. When you look at these two, can versus bottle, and carton versus packaging, there is literally no visual similarity. You see Keystone Light, it says, Keystone, not Stone. It has mountains, not gargoyles. It's red, it's blue, gray, and white. The visual dissimilarity is stunning. Now, we don't have to worry about 2017 because it's stunning now. One of the most striking things in the- Did you ask for summary judgment on that question? Yeah, I don't recall, Your Honor. But, where I'm going, Your Honor, thank you for that. I really, this really would have been such an easy case. If we had summary judgment, you would affirm in a heartbeat. No question. So, how can I ask you to overturn a jury verdict? Exactly. I love the Seventh Amendment. It's one of my favorites. I'm sure we'll hear it from Mr. Hagee. My friend, Mr. Hagee, about it. Yeah, we don't have to know her review. I'm sorry? Yes. We do not have to know her review. Finally, you don't. You know, that's what I wanted to talk to you about, Your Honor. And, I am going to go over my time. Could I request two more minutes just to address the standard review on the JML? Where I, because the question, the problem that I have, there was some evidence of confusion presented, you know, the brewery. I mean, the, you know, the stone brewing sign with the Keystone underneath it at the convenience store. Your Honor, the most, I commend the court's attention to excerpts of record 1415. And, the court says there was not zero evidence of actual confusion. That's not good enough. The legal standard is strong evidence of likelihood of confusion under one or more sleep craft factors, such as to give rise to an inference, not of possible confusion, but likelihood of confusion. Not zero is not the standard. That's point one. Point two, the best the court comes up with is three little retailer distributor examples that have no foundation, aren't based on testimony, don't have a retailer coming in saying anyone was confused. They're pictures in a, and there's three of them. And, three is not enough. This court has said repeatedly the denominator matters. And, three instances of retailer signage in a $350 million a year business is too trivial, and this court has repeatedly said. But, even with the jury, the huge deference we give to these juries. Your Honor. You know, frankly, if this was summary judgment, I agree with you. But, with a jury, it's just so different. Here's the difference, Your Honor. Sleep craft gives legal structure to your analysis. And, this court has reversed sleep craft error, even under a deferential standard of review. And, I would commend the court's attention to two cases in particular that make this clear. One is Stone Creek versus Omnia, 875 F3rd 426. In which, this is an appeal from a bench trial. This court was on clear error review.  You have one with a jury trial? I don't. What I've got is, I've got Falcon versus Rhino. That's where the district court properly granted J Moll. And, this court affirmed. But, I've got you, Stone Creek versus Omnia. That's reversing after a bench trial. Where clear error would otherwise apply. And, Judge McEwen, writing for the court, said, we reversed the district court's finding of no likelihood of confusion. Because, it is based on faulty legal foundations. And, network automation, a few years prior. This court vacated a preliminary injunction. Again, clear error review. Saying the showing of a likelihood of confusion over the sleep craft factors was insufficient on abuse of discretion review. I'd also cite the court to H&R Block versus Block. Case out of the Eighth Circuit. Vacates a preliminary injunction. Now, squirt. It's a squirt case. Same as the sleep craft factors. What I want to stress is, there were legal errors here. And, let me focus on three. And, then I'll sit down. In the hope that you'll still give me time to read. What I thought I would do is give you, like, another minute now. Three minutes for rebuttal. And, I'm going to give them a little extra time to make it fair. That's extremely fair. And, I'm very grateful, Your Honor. Thank you. I want to focus on the legal sleep craft errors. The court said three things. He said the marks are identical. They are not identical. That's legal error under this court's case. It's going back to Lindy Penn in 1984. The test is, are the marks similar? Viewing them in the entirety as they would be confronted in the marketplace. The answer to that under the proper legal standard is clearly no. And, that's a sleep craft error. Second, he said the products are related. Beer is beer. Not so. Legal error. This court has always said that when the products, even if they're roughly similar, travel to different audiences or aimed at different audiences, that doesn't make per se relatedness. A cheap plastic purse is not related to a Hermes Birkin just because they're both handbags. Who the target audience is matters. So, it's legal errors to relatedness of the goods and unactual confusion. The legal error is non-zero confusion is not enough. And, Your Honor, I'd like to focus on a couple of things that show that actual confusion favors us, the Nielsen studies. Nobody shifted either way from keystone to stone. That's positive evidence for us of lack of actual confusion. And, the second thing is the surveys were doctored. It's admitted that the surveys never tested, and the panel understandably referred to billboards and cans that just said stone. Those were either in marketing materials or they were created for litigation by SPC's experts. We never sold a can that just said stone. Don't take it from me. Take it from the red brief. Look at page 20 of the red brief. The only place they ever put our products side by side, it's single cans in the refrigerator, single can versus single bottle. And, our can visibly says keystone. It doesn't just say stone. What about the grab a stone, that bill on page 18 of the answering brief? Well, we've always said grab a stone. We've always said 30 stones. And, the reason that isn't confusing is a stone is our cheap beer in big cartons with mountains and coarse housemark and a different color scheme. So, Your Honor, again, there's legal errors in the sleek craft analysis. The district court's cursory analysis at 14 and 15, even if you also look at 30 to 31 because he did it twice, it's nowhere close to showing a likelihood of confusion. And, this court should, like the court in Stone Creek, like the court in network automation, like the court in Block, should exercise its legal authority to bring legal structure to this analysis. It's not just for juries to know it when they see it. So, this could be and should be. I think I need to cut you off now if you're going to have rebuttal time. So. Thank you, Your Honor. I very much appreciate the extra time.  Let's hear from the other side. And, let's give the other side 25 minutes, please. Good morning, Your Honors. Noah Hagee of Braunhagen-Borden for the plaintiff's stone. Could you speak up, please? Noah Hagee of Braunhagen-Borden for the plaintiff's stone verdict. I think we just heard from counsel's attempt to recite and go into deep factual inquiry, the reason why in the Ninth Circuit there's never been a holding, reversing a jury verdict in favor of trademark infringement. Dating back from Judge Anderson's decision in Sleekcraft from the 1970s onwards, the court has recognized the intensely factual nature, the complicated and intensely factual nature of these disputes. There are at least eight factors that the jury heard evidence on in the case. There were over 600 exhibits. There was almost 90 hours of argument and trial testimony. And, my friends had an opportunity with more than a dozen lawyers in court every day to make objections on the record. And, one of the things you did not hear from counsel, and, in fact, you can't even find it in their brief, I searched last night, is the words jury instructions. And, that's because Miller Coors concedes the jury was properly instructed. Under this court's longstanding law, the jury was presumed to have followed those instructions. Those instructions include, for example, on the question of consumer reports and social media evidence, the fact that the jury was inclined and entitled to look at that evidence and understand and believe that the speaker, meaning the posters of those communications, met what they said when they said they were confused. And, so, when counsel comes to court and says there was no evidence of confusion, there was no evidence of reverse confusion, respectfully, there are dozens and dozens of examples of that in the record. And, that's one of the problems of trying to post hoc go into such a detailed factual review on a record that is as dense as this one. I would like. To get to dozens, don't you have to include the ones that are clearly jokes? Well, respectfully, some are jokes and some are not. And, certainly, Miller Coors tried to argue that to the jury. But, there are, for example, specific and clear examples of reverse confusion where posters are on or tweeting at or going to Stone's Facebook page and asking whether a new Stone brewing imprint is affiliated with or partnering with Keystone. The court may have a different view, but there is reasonable interpretations of what that was. And, the jury was entitled to weigh that evidence. That's the entire purpose of the exercise. And, so, when you look at the totality and, again, dozens and dozens and dozens of examples of confusion coming in, I think you have to take a step back and look at what really happened here. And, I think, Judge Freeland, you remarked, there had been a consistent 20 plus year growth, year over year. Stone Brewing was one of the most successful craft brewers in the country. It had twice been deemed the world's greatest brewery on earth. It had won all kinds of awards. And, this was unrebutted in the testimony and evidence at trial and pretrial that Stone was a very, very special brand. It was incredibly unique. 2017 changed all of that. Within a very short period of time, Stone's sales fall off a cliff. Your Honor asked a question about, well, maybe this was the crowded field. But, no, we controlled for that and we looked at that specifically.  And, so, was the evidence that, like, whoever the other craft beer competitors are, in your view, did not go down? That's right. Because we have evidence of what their sales were? For the first time in Stone's history, it did not best and beat its competitors in the craft beer market. And, so, that's one of the key distinctions. When you heard counsel suggest that, well, maybe it was other factors. Maybe, you know, maybe Dissler was over inflating. No. And, Dissler is our damages expert in the case. She specifically controlled for that. But, we also have what I guess I would refer to as even more objective scientific evidence that's in the record, not from an expert, but from Miller Coors' own papers.  And, this is, you heard counsel refer to the Nielsen switching reports. They produced two different time periods for switching reports. In switching reports, just look at the substitutability of a particular brand and how it's engaging with other competitive products in the market. That's what's meant by switching. Before 2017, it wouldn't surprise the court to know that a super premium craft beer like Stone was engaging almost exclusively with other craft beers. So, if a consumer was going to their shopping basket and they weren't picking a Stone beer, they were picking a Lagunitas or they were picking one of your other favorite craft beers. After the rebrand, after the swamping of the market with Keystone Light emphasizing the word Stone, all of a sudden, my client's beer that used to just interact with craft beers, all of a sudden is beginning to interact with and be substituted for down market economy brands for the first time in its history. And, that's their own evidence. I mean, I cannot imagine a more interesting causal relationship between that period of time. And, then there's a second one. So, you're saying there's evidence of actually your customers buying Keystone Light? It's not that those two products were being substituted. This is just like the Brooksfield case where you're talking about a, or excuse me, the Ironhawk case where you're talking about consumers becoming familiar with Keystone Light's new brand, Stone. And, all of a sudden, when they see my client's beer, Stone Brewing, viewing that through the lens of, I don't know if this is good. It's too expensive, right? Or, whatever. Well, it's not that it's too expensive. In the words of Stone's CEO, all of a sudden, Stone was no longer cool. I mean, that is what Ironhawk is talking about when it's saying that when you lose the ability to control your own brand through swamping and through reverse confusion, all of a sudden, consumers who are maybe going to purchase a craft beer are no longer going to grab Stone. They're going to grab something else. And, that's- Wasn't that one of the issues? What you're suggesting sounds more like an association or dilution versus an actual confusion. And, is that significant? What we're not suggesting is some kind of dilution. I mean, here, we're suggesting that it's- Because you're saying it's the association of Stone with the dredge of Kuros Light, which is, you know, Keystone. And, that's swamped and, overall, hurt the reputation of Stone. So, that doesn't seem like a confusion. Two things could be true at the same time. We presented evidence, and we argue that there was confusion as to the sourcing. And, you have that from social media. You have that from the testimony of the witnesses. And, you certainly have that from the testimony of the experts. That when Keystone flooded the market and told the market that when you see Stone, you are now going to think of Keystone Light and Miller Kuros instead of Stone Brewing. When a consumer who's looking for a craft beer sees Stone on the shelf, they are going to be confused. Again, and it doesn't have to- You said we have the surveys, we have experts, and we have witnesses. Who are the witnesses who testified about confusion? I didn't think there were any. Were there? There were. So, Maria Stipp, for example, was, at the time of the rebrand, Maria Stipp was our CEO at the time of trial. But, in 2017, she was the president of Lagunitas Brewery, a competing craft brewery. And, her testimony was that when they saw the rebrand come out, they couldn't believe that it had happened. And, all of a sudden, Lagunitas was able to pull shelf space away, craft beer shelf space away from Stone. Which gets to one- Do you have any testimony from a witness saying, I was confused? We have testimony from, I mean, in a case like this, you often have the third party consumers and the retailers and the distributors whose communications are evidence that they are confused. I mean, that's the primary social media evidence that we have. Right, we have the social media posts. But, was there like live testimony of anyone who said, I thought this was confusing? We did not have live. We had anecdotal testimony through Mr. Cook, one of Stone's founders, who testified that consumers were coming up and saying that their father-in-law or a family member had mistakenly purchased Keystone or was asking questions of whether Keystone, excuse me, whether Stone was coming out with a light beer, or if they had a light beer, or if they were now partnered and associated with Miller Coors. I think that the, one of the, I mean, just moving along this, you know, thread of the problem with trying to retry a case on appeal like this, is counsel's argument that 2017 was just some kind of insignificant, minor, indistinguishable change from prior. And here, I really would ask the court to consider the actual trial testimony of Miller Coors' corporate representative on that issue. She was also deemed an expert on Miller Coors' archiving. And here's the questions that were put to her on the record. This is at SER 1154 and 1155. Never before, question, never before had Miller Coors put Stone or Stones on the primary Keystone packaging, the can, correct? Answer, correct. Okay. And in fact, never before on the packaging, on the side of the packaging, had Miller Coors broken up Key and Stone onto two lines, correct? Answer, no. Okay, so in that sense, no, you agree with me, I agree, it had never been done before. Next question. So you would agree that in this sense as well, this breaking up of Keystone on the side panel of the packaging into Key and Stone, that's distinguishable from how Miller Coors had presented things prior to 2017, correct? Answer, correct. And prior to 2017, Miller Coors had never, in any of the materials you saw in the archive, shown the word Stone in 3D before, had it? Answer, I don't know. Question. And in fact, Ms. Harris, you're not aware, if we pull up your 529 transcript at 21, you're not aware at any point prior to 2016 in which Miller Coors centered its Keystone branding around the word Stone. Are you? Answer, no. Question. You're not aware, right? Counsel, can I ask, what about page 7 of the opening brief where there's the 1994, looks like a poster that says, start your party with the Stone? I think as the testimony came in at trial, including through Ms. Harris, she was unable to confirm that that material ever made it into market. And there were actual catalogs of the material that had been available and put into market. None of the Stone or Stone's material prior to, I think, even 2000 was in that catalog. Now, can I ask, for the Latches inquiry, does it matter if it made it to the market or does it just matter that they thought about it? Well, I think for Latches, what we're looking at was, did something dramatically change in 2017 that gave rise to the cause of action on which Stone sued? And the answer I think there is unequivocally yes. And sometimes protesting too much that this is somehow a clear issue, I think, exposes that. And again, this is Miller Coors' own corporate representative under oath admitting that prior to 2016, Miller Coors had never centered its branding around the word Stone. And so then the natural question is, well, what is the evidence in the record on Summer Judgment in a trial that after 2017, Stone had become the focus? Well, you can look at the dozens and dozens of emails of corporate presentations where the entire focus of the rebranding effort was to change the name and to revolutionize the brand into the word Stone. And that's what the court was reacting to, and that certainly was what Stone Brewing was reacting to. If you want to look even further back, if you want to look at the party's 2010 correspondence, what counsel omits is the fact that there was actually a response from Miller Coors to that cease and desist letter. And Miller Coors states, we've only used Stones, and we are not intending, the implication is we're not intending to use Stone, that Stone Brewing has Stone, we've used Stone haphazardly. The parties continue their negotiations, and then Miller Coors abandons its trademark application for Hold My Stones. At that point in time, my client is in a position where, and by the way, the next thing that happens is Miller Coors drops the trademark registration symbol from the word Stones on some of the packaging that it had put in the market. The Keystone Campaign ends less than a year and a half later. At that point, no reasonably prudent attorney would advise my client, well, you need to go and sue Miller Coors for these random taglines that it has out in market that are inconsistent, that aren't forming an impression around the word Stone, and that in Miller Coors' own admissions, again, this is all of their emails leading up to the Own the Stone Campaign, they're reflecting on the fact that we don't stand for anything. Our loyal consumers don't believe that we are associated with Stone at all. This was their own internal consumer research, where they're hearing from their consumers and showing them this new packaging with the 3D image of a stone can prominently displayed on their primary packaging, and showing them this new advertising and promotional material all focused around Stone. And the consumers are telling them, you know, this looks like a new brand. This looks like a new product. I can see it catching on, but I don't associate Keystone with anything, any of that material. And why do you think Tillamook isn't the controlling case on this? Well, Tillamook is one of many cases that I think informs the analysis. The difference in this case from Tillamook, I mean, first of all, Tillamook Creamery was selling the competing infringing product in its own stores. But just as to the standard of review, is there a reason? What's your best argument for it not being DeNova? Well, I think Tillamook is an outlier. Most of the cases that come after it, including Jarrow and the case that Ms. Sullivan likes to repeat, and I think the—I can give you the rest of the sites. We have Corrington v. Webb, which is abuse of discretion and latches. We have Grupo Gigante. Judge Graber was on that panel, which was, again, abuse of discretion or clearly erroneous. We have Nissan Motors, 2004, abuse of discretion. And we have Eat Right Foods in 2018, which, again, is abuse of discretion. And I guess I don't want to struggle with the court over, you know, when you begin your abuse of discretion fact-based review and when you begin DeNova. I think that when you're— But do you think this is more factual than legal, though? Like, I mean, usually we can't have this kind of conflict. I don't know if this case needs to go on bonk to resolve this conflict, but usually panels can't disagree with each other. But let's just say we're starting from scratch. Is this more legal or is it more factual? What kind of inquiry is this? We think it's incredibly factual. And on that ground, even if the court were to take this up and want to put itself in the trial court's position and go back through all the evidence, I mean, even in Tillamook, the court references the abuse of discretion standard when you're actually applying the facts into the elements of whether, for example, the change that occurred before and after the Tillamook country smoker, the alleged infringer in that case, was significant. The court was deferring to the trial court's determination there. It said that's an abuse of discretion to determine whether that was a significant change. And so I think that—I mean, part of the struggle here is doctrinally. Because Latches is borrowing from the statute of limitations, which is a legal definition, I think the courts—maybe that's why Tillamook was a little bit confused on that point. But here it's an equitable doctrine. And it's an incredibly fact-intensive inquiry to try to determine what was Stone's position. Was it reasonably thinking it had a viable cause of action in 2010 or 2011 or 2012 where it should have gone out and sued Miller Coors, even though it probably wouldn't have won? There probably wasn't likelihood of confusion at all at that point in time. And do we want to encourage plaintiffs to wantonly just file lawsuits, otherwise they risk losing a valuable piece of property they've invested their entire business in over 20 years? I think the answer to that has to be no. And we have to let the district court, who's receiving all of this evidence, have some discretion when reviewing that and weighing that, particularly in a case such as this where you have such a dramatic change in the defendant's branding and packaging. Can I go to the arrogant bastard damages question? Of course. So what is your theory on why that should be lumped in with this? So when Stone IPA and Stone's products began getting pulled from retail shelves, they were tied—when they were going out on trucks through distribution channels, they were tied—sorry, arrogant bastard was tied into those sales. And so when Stone Brewing's products got removed from over 10,000 points of distribution around the country, that hurt arrogant bastard's worth, because arrogant bastard then was not going to be put on the shelf. So there's no—it's not a theory of confusion. No one would make that confusion, obviously, right? Because arrogant bastard had totally different marks. That's correct. And I think the evidence at trial was that that is within the ambit, that is part of the losses that Stone suffered. When Miller Coors infringed and when Stone lost those 10,000 points of distribution, arrogant bastard lost those points of distribution as well. And so those were profits that— That was almost an indirect loss, because basically Stone lost, so then distributors cut Stone, which then had the ripple effect of cutting arrogant bastard's distribution. Yeah, I don't know if I would characterize it as indirect, but it certainly was a one-to-one consequence of Stone losing those points of distribution. It seems a little attenuated to me, but— And, you know, to be fair, Your Honor, Miller Coors argued that to the jury. They presented this issue to the jury. The jury awarded, as the court is aware, approximately a quarter of the compensatory damages that Stone requested at trial. If that argument held weight and they thought it was attenuated, certainly the jury would have been within its right to reduce, you know, the $216 million request by that amount. Assume that we think that it's legally attenuated, that you couldn't even consider, the jury couldn't even consider it, what would you do then? I think that under this Court's deference to damages, in particular here where you have a general jury verdict and one line for damages, as long as the jury could come to any conclusion from the preponderance of evidence that was in front of it to the $56 million in this case, you have to affirm. In other words— I thought, though, we consider their general damages. If they considered the—if the general damages alleged were wrong, don't we have to remit under that situation? No. Like, if the pool was too big, and that's what the jury was considering, and the pool was, you know, improperly too big, shouldn't we remit it for a reconsideration? I think the remitter is only if there was no possible way to get to the actual damages number that the jury found. Oh, is it? Okay. And that—again, the— The amount requested was considerably in excess of the $56 million, as I recall, correct? That's correct, Judge Graber. So is it—is your argument essentially that we should understand this verdict to not include the arrogant bastard fear at all? I guess what I would say is it very well may not, but it certainly—there are certainly ways to get to $56 million, almost an infinite number of ways to get to $56 million that do not include it. And I think—am I right that they asked for a special verdict for him, and you opposed it, and then I guess you won that issue, and now— Is there any presumption we have based on whether—the fact that we can't really figure out what happened anymore? No, the court asked the parties to meet and confer over and over again, and finally there was a stipulation as to the use of the general verdict form. There was no standing objection. Miller, of course, did not object to that, just like Miller, of course, did not object to any of the jury instructions that were made to the jury at trial. This panel has been very patient with all the counsel who have argued before it. I appreciate you listening to my argument. If there's no further questions, I'll cede the remainder of my time. Thank you. Let's put three minutes on the clock, please. Thank you very much, Your Honors. Laches, Tillamook controls DeNova review here. Why? The only issue is the start date. It's the start date that gets DeNova review. That's clear from Tillamook. It's not altered by Internet specialties, and that's all we're challenging here. Of course there might be abuse of discretion review if other facts were in play, but here we have the textbook case of Laches. 2010 letter, stone, stones, hold my stones. 2018 lawsuit, eight years later, four years after the expiration of the analogous California statute of limitations, stone, stones, hold my stones. We were lulled into thinking that, of course, we could make stone a little more prominent on our otherwise identical packaging. That's what Laches is designed to protect. Likelihood of confusion. Your Honor, here I want to just focus on the core legal error. You have to view the products in their entirety in the context the consumer confronts them in the market. The surveys, when they weren't doctored. In other words, if you don't redraw the can so it just says stone, if the can says, like, the consumer sees it in the market, look at red brief 20, key, stone, light, then they're dissimilar. That's how the consumer. And I would commend the Court's attention to excerpts of record page 241, where SVC's own witness, Mr. Palmettiere, admitted that the survey research done by the prior expert, Mr. Stewart, changes if you use the right cans. Move in the cans the consumers see instead of the made-up doctored cans. And you know what happens to confusion? Don't take it from me. Take it from the expert, SVC's expert, ER 641. Confusion goes down to 4% to 5%. That's their expert's admission. Confusion under a level of 10%, as their own expert admitted, is not enough to show likelihood of confusion. That error as to likelihood of confusion is a legal error. It's faulty legal foundations. It's a ground for reversal of the denial of JAMAL here, just as there was clear error review or abuse of discretion review in Stone Creek and network automations. And this court said sleek craft has to have meaning. And if this case doesn't call out for reversal to give sleek craft meaning, I'm not sure what could. Mr. Hagee didn't offer Judge Freelandview a single witness who testified as a consumer in the market, facing the actual cans and the actual boxes, who was confused. Not a single one. If there was so much confusion, or even confusion as to association, wouldn't there have been a single person who came along and said, I was confused. I thought when I paid $2.50, I was getting Keystone Light. Oh, I thought when I was paying $60, I was getting that Hoppy Hazy craft beer that the tech bros like. They didn't come up with a single one. And the lack of evidence of actual confusion is probative here. The 4% to 5% is damning. That's not our evidence. That's their admission. ER641, 4% to 5%. The social media posts, I'm sorry, but they were created for litigation. That was SBC's founder trying to gin up people who, after the fact, would say, hey, there's confusion here. Those are not consumers in the marketplace. It's a violation of Lindy Pennington's one last thought. It's crucial in the sleek craft factors to focus on degree of care of the purchaser, marketing channels. We sell 98% in grocery stores. They sell 40% in bars and restaurants and tasting rooms. Those are different marketing channels. We aim at different customers. Our customers are not discerning about anything other than price. Their customers are very discerning about hobbiness, haziness, and all those craft qualities that the gargoyle so likes. These couldn't be directed at two more different audiences. That matters. The district court ignored it. And these were not related goods when properly looked in light of the other sleek craft factors. This court has made law out of trademark infringement. Don't take it away here by letting this verdict stand. We respectfully urge you to reverse. And Latchis decides it. And then you don't have to reach the hard question I've posed. Thank you. Thank you, both sides, for the helpful arguments. This case is submitted, and we are adjourned for the day. Just to remind everyone, the law clerks will talk to the students, and then we'll come back after our conference and talk to the students as well. Thank you, everyone.
judges: GRABER, FRIEDLAND, BUMATAY